**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Duane Francis SNELLING,
Defendant–Appellant.**

**No. 87–5325.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1988.
Decided Sept. 1, 1988.

Daniel M. Scott, Minneapolis, Minn., for defendant-appellant.

Donald M. Lewis, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff-appellee.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and PECK,* Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

After a twelve day jury trial, defendant-appellant Duane Snelling was convicted on eleven counts of inducing interstate transportation in aid of a scheme to defraud in connection with his activities with Kitco, Inc., a business of which he was sole owner and manager from September 1981 to July 1982. Kitco's office was located in New Hope, a suburb of Minneapolis. Kitco sold plastic forming machines as part of a business opportunity package that included the training and marketing of plastic items produced by the machines. The machines sold by Kitco could be operated in the basement or garage of the owner's home. The machine heated a layer of plastic drawn by a vacuum over molds placed on the bed of the machine. The formed plastic was then cooled, trimmed and painted to produce embossed signs such as the kind displayed in commercial storefronts. The plastic could also be used to form paint can and roller trays, plaques and other items.

Snelling became involved in the plastic forming business in 1981 when he met Robert Velasco who was producing and marketing plastic signs in a business known as Distinctive Products. Snelling and an associate, John Farkas, worked for Velasco temporarily and then left to begin their own businesses. Snelling recruited several salesmen who worked on commission in various cities. Snelling adapted promotional material initially developed by Velasco and used it to assemble a "pitch book" or presentation book for Kitco salesmen. Advertisements were placed in area newspa-

---

* The HONORABLE JOHN W. PECK, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

pers to attract customers. Interested investors were urged to travel to New Hope to meet with Snelling. If a sales contract was signed, the salesman would receive a 20 percent commission. The package sold for $23,865. Snelling authorized Kitco salesmen to tell potential investors that Kitco would provide the market for the products made on each machine. A newspaper advertisement declared: "contract work gives you $3,000 per month guaranteed income." Those who responded to the advertisement received a letter from Snelling that stated:

Our plan for you is time proven, effective and workable. With no previous experience on your part, you can be successful. You have your own company in this profitable and easy to manage business. We provide several years of successful experience in order to guarantee your success. We also provide all the necessary contract and retail outlets, so no selling is required by you, whatsoever, other than customer relations and business management.

A Kitco brochure stated:

Q: Is there any selling involved?
A: You will be a manufacturer, and as such must spend your time making the product. Your orders will come from manufacturers' representatives, dealers and distributors for the products you choose to manufacture. Your training will include the entire spectrum of marketing the many different types of products that can be made on this equipment. You do no actual selling yourself.
Q: How long before I start earning money?
A: This is a cash business and a turnkey type of operation. It can be arranged for your cash income to start from the first day your shop is set up.

Another promotional brochure proclaimed:

The list of products and product components that can be manufactured by our equipment, numbers in tens of thousands. Some examples would be:
indoor and outdoor identification displays
lighting products
blistering packaging containers
point of purchase displays
wall plaques
parts trays
module sign letters
plastic molds for plastercraft

Since it takes time to establish yourself in one of the many product lines, we have developed a tried and true system for starting you out profitably.

The day you open your doors you know you have the core of a sales dept. and the assurance that only thorough training and fine equipment can give you.

Our business opportunity program is basically concerned with production of a wide variety of ready to sell products which are sold both at the retail and wholesale level to every small and large business through representatives, manufacturers reps, dealers, distributors, and jobbers. Our program offers all the services necessary to assist you in attaining a profitable business level in the shortest possible time. Products which you will produce in your first weeks of operation will provide you with immediate income. The operation of our equipment and systems has been perfected to such a degree that it is possible for us to make this opportunity available to individuals or groups who have no prior experience in the plastics industry. This is primarily due to the methods which we have developed to simplify the processing and basic preparation for production along with finishing procedures.

In April 1982, Snelling proposed to Shamrock Industries, a Minneapolis plastic processor, that Kitco's "subcontractors" would deliver "scrap" plastic to Shamrock and Shamrock would grind it and extrude it into recycled plastic. Kitco would then purchase the recycled plastic with an additional supply of virgin plastic, and have Shamrock ship it back directly to Kitco machine owners. The agreement was formalized on May 28, 1982. Kitco investors then received notices from Kitco to send their paint can trays to a new address. Unbeknownst to the investors, this address

was that of the plastic reprocessor, Shamrock, not a distribution center for their products. All of their products were merely reprocessed into raw plastic and shipped back to Kitco operators.

In July 1982 Shamrock stopped supplying plastic to Kitco because it was not being paid. Kitco's operators were also complaining at that time that they were having difficulties obtaining payment for the products they had finished and shipped. They were not receiving money for the completed contract order and, in fact, were being shipped raw plastic which was debited from their accounts.

At approximately the same time the deal with Shamrock fell through, Snelling left Kitco and transferred the business to Farkas. Snelling was subsequently indicted by a federal grand jury on Feburary 4, 1987. He was charged with eleven counts of inducing interstate transportation in aid of a scheme to defraud in violation of 18 U.S.C. § 2314. After ten days of trial, the jury returned verdicts of guilty on all eleven counts. Snelling was sentenced to 30 months imprisonment and to probation for a term of 5 years upon his release from confinement. The court also ordered Snelling to pay $10,000 in restitution to each of the eleven victims of the offense.

Defendant-appellant Snelling argues that Kitco was set up as a legitimate business opportunity with a quality machine, a qualified training force, and a support staff ready to answer questions. Snelling claims that the business was adequately capitalized but that its downfall was in not being able to "balance" an adequate manufacturing organization with the proper amount of orders to keep the manufacturers in business. Appellant further argues that, if anything, Kitco was only engaged in "puffery" not fraud or deceit. Appellant claims that full disclosure of future plans and problems is not necessarily required and

cites, in support, *Vaughn v. General Foods Corp.*, 797 F.2d 1403 (7th Cir.1986), *cert. denied*, 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987).

The government's position is that, regardless of Snelling's intentions *at the inception* of the business, he knew his promises of profitable contract work were false *at the time* he induced the eleven persons named in the indictment to travel in interstate commerce. The government submits that Kitco's potential investors were shown fabricated orders and were misled into believing that Kitco had numerous commitments from retail outlets; there was no significant effort by any of Kitco's employees to market the plastic products. Without the investors' knowledge, Kitco negotiated to grind the paint trays manufactured by machine owners into scrap. At the same time Kitco was selling the package to new investors, telling them that the business was thriving.

▪ In reviewing the guilty verdict, this court is required to view the evidence in the light most favorable to the government, to accept as established all reasonable inferences supporting the conviction and sustain the verdict if there is substantial evidence to support it. *See United States v. Muckenthaler*, 584 F.2d 240 (8th Cir.1978); *United States v. Andrade*, 788 F.2d 521, 525 (8th Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986).

▪ The essential element of intent to defraud, as proscribed in 18 U.S.C. § 2314 [1] need not necessarily exist at the very inception of the scheme, as Snelling argues, but rather must exist at the time of the offense, which is committed when the victim crosses state lines as a result of the defendant's fraudulent inducement. *See United States v. Ferrara*, 571 F.2d 428, 429–30 (8th Cir.1978) (finding that 18 U.S.

---

1. 18 U.S.C. § 2314 provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or

to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

C. § 2314 is meant "to reach the fraudulent scheme whereby the criminal is the efficient cause of the interstate transportation"). The timing of these interstate travels is significant in this appeal and must be viewed in conjunction with the status or health of Kitco, Inc. at the time the travels occurred.

The eleven count indictment against Duane Snelling involved the fraudulently induced interstate travel of eleven Kitco investors over the span of time from February through July of 1982. The defendant's counsel conceded in oral argument that there was "some support" in the evidence for the last five counts. Those five counts encompassed activity specifically from May 18, 1982 until July 21, 1982. Our focus is therefore directed primarily on Snelling's (and consequently Kitco's) activity from February to May of 1982.

■ From Kitco's beginnings in the Fall of 1981, there were some indications that Kitco was making fraudulent representations to potential investors about the guaranteed success of the Kitco business opportunity. It became increasingly more obvious six months later. It is reasonable to conclude from the entire course of events that there was sufficient evidence for a jury to find a scheme to defraud. Fraudulent intent is often not able to be proven by direct evidence but may be inferred by a series of acts and relevant circumstances. *See United States v. Lanier*, 838 F.2d 281, 283 (8th Cir.1988); *United States v. Themy*, 624 F.2d 963 (10th Cir.1980).

■ There is evidence in the record that at least as far back as early 1982, Kitco's salespeople were using false purchase orders as a promotional tool. These order forms, included in the "pitch book," falsely represented that Kitco had made huge sales of plastic goods. One of Kitco's former salesmen, Charles Hesler, testified that he had in his "pitch book" two letters, dated June 15, 1981 and July 1, 1981, that were addressed to Kitco by J & J Distributors and signed by "Harvey Butterfield." J & J Distributors was a non-existent company and had the same address as Formaster, John Farkas' shop; Harvey Butterfield

was also an alias for Snelling. Tr. at 647–50. The dates of the two letters preceded the time Kitco commenced business. Date of shipment of these orders was to occur in August and September of 1981—also before Kitco was in operation. Nancy Andrews, another former Kitco salesperson, confirmed that she also used the same fabricated order forms signed by "Harry Butterfield" as part of her selling efforts, advancing the notion that Kitco had already made substantial sales to established customers. Tr. at 806.

In viewing the record, nowhere is it indicated that Kitco attempted any sort of marketing effort. This is dispositive because, as stated above, Kitco promoted the sales and marketing support of its company as an integral part of its package. Kitco proclaimed that it would be totally responsible for creating the market for the plastic products; as previously pointed out, its brochures declared: "You will be a manufacturer and as such must spend your time making the product.... You do no actual selling yourself." Warren Anderson, the only manufacturers' representative who testified, stated that there were no other manufacturer's representatives working for Kitco that he was aware of. Tr. at 620. Over several days time Anderson made only two contacts and arranged no sales because he did not believe the business to be viable. Tr. at 620–21.

By the time Kitco began making overtures to Shamrock in April, 1982 to put together their plastic recycling scheme, the evidence is clear that the business was in trouble. Kitco concealed Shamrock's identity and told investors that they were sending their plastic products to a retail distribution center. Against this backdrop, Kitco representatives continued to tell potential investors that Kitco was a thriving, profitable operation. Contrary to the defendant's arguments, substantial evidence in the record supports the jury's finding that Snelling was not engaged in mere "puffery" but was guilty of reckless and baseless representations in order to carry out its fraudulent scheme.

Accordingly, we find sufficient evidence to affirm the jury's guilty verdict.